UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FRANK SURVEYING CO., INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:22-CV-2837-B |
| | § | |
| M. DILLON HARP, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Frank Surveying Co., Inc. ("Frank Surveying")'s Emergency Motion for Temporary Restraining Order (Doc. 2). In short, Frank Surveying alleges that Harp copied its confidential information before leaving to work for a competitor. *See generally id.* In its Motion, Frank Surveying seeks a Temporary Restraining Order ("TRO") that (1) requires Harp return all confidential information to Frank Surveying; (2) requires Harp make available for forensic imaging any electronic devices, including smart phones, computers, and external storage drives he may have used to copy confidential information; (3) requires Harp make available for forensic review any cloud-based storage accounts Harp may have used to access or copy confidential information; and (4) enjoins and restricts Harp from using Frank Surveying's confidential information. *Id.* at 11–12.

The Court held a hearing on the Motion on January 9, 2023. This Order **AMENDS** and further clarifies the ruling issued from the bench. Specifically, because Frank Surveying has met its burden for a narrow TRO but seeks relief that is overly broad, the Motion is **GRANTED in part and DENIED in part.** To the extent Harp has Frank Surveying's confidential information,

he is **ORDERED** to return such information to Frank Surveying. Defendant Harp is further **ORDERED** to refrain from using or disclosing any and all confidential, proprietary, and trade secret information belonging to Plaintiff Frank Surveying Co., Inc. until the Court can rule on Frank Surveying's application for a preliminary injunction. All other requested relief is **DENIED.**

## I.

## BACKGROUND

Frank Surveying is a land surveying company for oil and gas clients throughout the United States. Doc. 2-5, Loessin Decl., ¶ 3. Frank Surveying hired Harp as its Survey Director in 2014 and eventually promoted him to Vice President of Surveying in 2020. *Id.* ¶ 4. In connection with his employment, Harp was provided and had access to Frank Surveying's confidential information. *Id.* ¶ 5.

To protect this information, Frank Surveying required Harp—and its employees generally—to sign an Employee Confidentiality Agreement ("Confidentiality Agreement"). *Id.* ¶ 6; *see also* Doc. 2-1, Ex. 1, at 1–8. In the Confidentiality Agreement, Harp agreed to "hold the Confidential Information received from [Frank Surveying] in strict confidence," to "not reproduce the Confidential Information nor use this information commercially or for any purpose other than the performance of [his] duties," and to "not disclose or divulge either directly or indirectly the Confidential Information," among other things. Doc 2-1, Ex. 1, at 5 ¶¶ A–C. Harp also agreed, upon his termination, to "deliver to [Frank Surveying] any drawings (electronic or paper), notes, documents, equipment, and materials received from [Frank Surveying] or originating from employment with [Frank Surveying]." *Id.* ¶ D.

In addition to the Confidentiality Agreement, Harp agreed to abide by Frank Surveying's Employee Handbook, which prohibited employees from revealing or divulging confidential

information. *See* Doc. 2-2, Ex. 2, at 9. Frank Surveying also required usernames and passwords for employees and limited access to company data. Doc. 2-5, Loessin Decl., ¶ 8.

In the fall of 2022, several Frank Surveying employees left to work for a competitor, Manhard Consulting, LLC ("Manhard"). *Id.* ¶ 9. And in November 2022, Harp indicated he too was planning to resign at the end of the month to join Manhard. *Id.* Harp's last day with Frank Surveying was November 22, 2022. *Id.* ¶ 11. A few weeks after Harp's departure, Frank Surveying received an electronic file activity report detailing Harp's activity from 2021 until his separation. *Id.* ¶ 14. The file report indicated that Harp had copied confidential documents to an external drive[1] on several occasions: On March 19, 2021, Harp copied a single file from Frank Surveying's servers. Doc. 13-1, Loessin Supp. Decl., ¶ 3. On August 1, 2022, Harp copied "over 200 files related to certain 'base maps'" from the servers, followed by a large amount of personal files. Doc. 2-5, Loessin Decl., ¶ 14. And on August 15, 2022, Harp had copied confidential files from one external device to another. *Id.*

The files consisted of, among other things, Frank Surveying's "base map" files.[2] *Id.* ¶ 15. Frank Surveying considers such files confidential and proprietary because they contain "compilations of data derived from various jobs in specific geographic areas" and represent "extensive work product, such as legal opinions and survey work." *Id.* Frank Surveying also states that the files allow it "to reference previous data points for certain areas, thereby saving time and resources for projects." *Id.*

---

[1] The external device is believed to be a USB drive. Doc. 2-5, Loessin Decl., ¶ 14.

[2] Frank Surveying also believes Harp "may have copied other confidential information . . . including rate sheets and documents related to bid proposals." Doc. 2, Mot. TRO, 4–5.

For his part, Harp claims he did not misappropriate any confidential information. *See generally* Doc. 9-1, Harp Decl. Rather, Harp says he "would sometimes copy work-related files from [Frank Surveying's] server to a portable USB thumb drive" for purposes of remote work during the COVID-19 pandemic. Doc. 9, Resp., 2–3; *accord* Doc. 9-1, Harp. Decl., ¶ 5. Specifically, Harp claims that occasional problems with Frank Surveying's VPN led him to download files so that he could continue work even if he could not access the server remotely. Doc. 9-1, Harp Decl., ¶ 5. Thus, "[d]uring his entire employment with [Frank Surveying], Harp used only one USB thumb drive to store [Frank Surveying's] confidential, proprietary, and trade secret information." Doc. 9, Resp., 3; *accord* Doc. 9-1, Harp Decl., ¶ 5. And when Harp left Frank Surveying, he "made a point to leave it specifically on the base of [his] computer" and inform the owners of its location. Doc. 9-1, Harp Decl., ¶ 6; *see also* Doc. 9-1; Ex. 1-A.

Frank Surveying acknowledges that Harp left a USB drive in his office. *See* Doc. 2, Mot. TRO, 5. But Frank Surveying asserts that, based on a forensic review of the USB drive, there are discrepancies between the files Harp downloaded (according to the electronic activity file report) and the contents of the USB drive left on his desk. Doc. 2-6, Cramer Decl., ¶ 11. In other words, a forensic review of the USB drive alone cannot determine whether files were copied to other computers, external devices, or whether data on the USB drive was overwritten. *Id.*

## II.

## LEGAL STANDARD

A TRO is a drastic remedy, the purpose of which is to "preserve the status quo and prevent irreparable harm just so long as is necessary to hold a hearing, and no longer." *Comput. Scis. Corp. v. Tata Consultancy Servs. Ltd.*, 2019 WL 2058772, at *2 (N.D. Tex. May 9, 2019) (Lindsay, J.) (internal alterations omitted) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters*

*& Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974)). The party moving for a TRO must establish "(1) a substantial likelihood of success on the merits; (2) a substantial threat that it will suffer irreparable injury absent the injunction; (3) that the threatened injury outweighs any harm the injunction might cause the defendants; and (4) that the injunction will not impair the public interest." *Enrique Bernat F., S.A. v. Guadalajara, Inc.*, 210 F.3d 439, 442 (5th Cir. 2000); *see also BNSF Ry. Co. v. Panhandle N. R.R. LLC*, 2016 WL 10827703, at *1 (N.D. Tex. Dec. 30, 2016) (O'Connor, J.) ("A temporary restraining order . . . is simply a highly accelerated and temporary form of preliminary injunctive relief. . . .") (internal quotation omitted).

## III.

## ANALYSIS

A.   *Substantial Likelihood of Success on the Merits*

"To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that [it] is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). Frank Surveying asserts that it is likely to succeed on the merits of both its Defend Trade Secrets Act ("DTSA") and breach of contract claims. Because the Court finds Frank Surveying has carried its burden as to its DTSA claim, the Court need not address the breach of contract claim. *See Intel Corp. v. Rais*, 2019 WL 164958, at *3 (W.D. Tex. Jan. 10, 2019) ("To grant an injunction, the Court need only consider whether Plaintiff has shown a likelihood of success on the merits for one of its claims.").

To establish trade secret misappropriation under DTSA, a plaintiff must allege: (1) a trade secret, (2) misappropriation, and (3) use in interstate commerce. 18 U.S.C. § 1836(b)(1); *see also Tata Consultancy*, 2019 WL 2058772, at *3.

1. Existence of a Trade Secret

DTSA defines a trade secret as various forms of information for which the owner has taken reasonable measures to keep secret, and which derive independent economic value from not being generally known or readily ascertainable. 18 U.S.C. § 1839(3). "At the [TRO] stage, a court does not determine that the information at issue is a trade secret; rather, it determines whether the applicant has established that the information is entitled to trade-secret protection until the trial on the merits." *Tata Consultancy*, 2019 WL 2058772, at *3 (internal quotation omitted).

Here, the Court finds Frank Surveying has sufficiently established the existence of trade secrets for this stage of the litigation. Frank Surveying alleges Harp downloaded "base map" files, which are "compilations of data derived from various jobs in specific geographic areas, whether that be boundary lines, well site locations, or geographic features." Doc. 2-5, Loessin Decl., ¶ 15. "The maps . . . allow [Frank Surveying] to reference previous data points for certain areas, thereby saving time and resources for projects." *Id.* Frank Surveying considers the information confidential and proprietary. *Id.* And Frank Surveying has pointed to reasonable measures taken to protect this information, such as Confidentiality Agreements for employees, restrictions in the Employee Handbook, and passwords and data-access limitations. *Id.* ¶¶ 6–8.

2. Misappropriation

Second, Frank Surveying has presented evidence of misappropriation. DTSA defines misappropriation as the "acquisition of a trade secret of another by a person who knows or has

reason to know that the trade secret was acquired by improper means" or the "disclosure or use of a trade secret of another without express or implied consent" under various circumstances. *See* 18 U.S.C. § 1839(5). "Improper means" is further defined to include actions such as theft or the breach of a duty to maintain secrecy. *Id.* § 1839(6).

As a threshold matter, the Court disagrees with Harp's contention that misappropriation requires the "disclosure or use" of trade secrets. *See* Doc. 9, Resp., 5. Rather, the statute defines misappropriation as *either* the acquisition of trade secrets through improper means or the disclosure or use of trade secrets under various circumstances. *See* 18 U.S.C. § 1839(5). In other words, disclosure or use is not a requirement for finding misappropriation. *See Tata Consultancy*, 2019 WL 2058772, at *3 ("[A] trade secret is misappropriated when it is acquired through improper means, which includes a breach or inducement of a breach of a duty to maintain secrecy.") (internal quotations omitted); *Intel Corp.*, 2019 WL 164958, at *4 (finding misappropriation where "[defendant] knew that the materials in question were Intel's trade secrets, and . . . took them by improper means").

Here, Frank Surveying has presented adequate evidence of misappropriation; namely, that Harp took materials he knew were trade secrets and improperly copied them to a personal USB drive prior his departure despite his obligations under various agreements. *See generally* Doc. 2-5, Loessin Decl. To be sure, Harp contests this characterization and claims he did not take any confidential information with him. Doc. 9-1, Harp Decl., ¶¶ 10–11. Harp says he only transferred files for purposes of remote work and left the USB drive on his desk when he left. *Id.* ¶¶ 5–6. But several pieces of Frank Surveying's evidence undermine Harp's contentions.

First, the electronic file report depicting Harp's computer activity since 2021 does not suggest Harp was routinely transferring files to act as backups for remote work. Rather, the

electronic file report shows limited instances of transfers but, on at least one occasion, a large quantity of files. *See* Doc. 2-5, Loessin Decl., ¶ 14; Doc. 13-1, Loessin Supp. Decl., ¶ 3. The first transfer identified was March 19, 2021, when Harp copied a single file to a USB drive. Doc. 13-1, Loessin Supp. Decl., ¶ 3. The second time was August 1, 2022, when Harp copied over 200 base map files to a USB drive, followed by a host of his personal files. Doc. 2-5, Loessin Decl., ¶ 14. The electronic file activity report also indicates that Harp transferred or copied several confidential files from one external device to another external device on August 15, 2022. *Id.* In short, Harp's file transfer activity—several hundred confidential and personal files on a single day and only two other transfers since 2021—is not consistent with an employee routinely using a USB drive to take his work home.

And while Harp says he left the USB drive in question on his desk prior to his departure, Doc. 9-1, Harp Decl., ¶ 6, a forensic examination of that USB drive indicates potential discrepancies between Harp's file transfer activity and the contents of the USB drive. Specifically, a forensic examiner indicated that "[b]ased on the filing listing [of the USB drive left on Harp's desk], it was determined that the USB did not contain a record of all the files identified as confidential by [Frank Surveying] and previously copied by Harp on August 1, 2022, and August 15, 2022." Doc. 2-6, Cramer Decl., ¶ 11. Similarly, based on the USB drive alone, the forensic examiner was unable to determine if files were copied to other computers or if prior contents of the USB drive had been overwritten. *Id.* These findings, combined with the file transfer from one external device to another on August 15, 2022, raise serious doubts that the USB drive left on Harp's desk singularly contains all the files from the electronic file activity report.

Frank Surveying also provides circumstantial evidence regarding the timing of the file transfers, Harp's resignation, and the prior departure of other employees to Manhard. In fall of 2022, several employees left to work for Manhard, including one employee that announced his departure in August 2022. Doc. 2-5, Loessin Decl., ¶ 9. In short, Harp's file transfers are closer in time to the employee exodus to Manhard than the remote-work demands of the pandemic. *Compare id.*, *with* Doc. 9-1, Harp Decl., ¶ 5 (contending that Harp began copying base map files for remote work beginning in March 2020 due to the COVID-19 pandemic).

### 3.     Use in Interstate Commerce

Third, Frank Surveying has adequately established the interstate-commerce nexus required under DTSA. DTSA provides that the owner of a trade secret may bring a civil action if "the trade secret is related to a product or service used in . . . interstate or foreign commerce." 18 U.S.C. § 1836. Frank Surveying indicates it uses the base map files "for jobs in Texas and other states" as part of its nationwide servicing of oil and gas companies. Doc. 2-5, Loessin Decl., ¶ 15.

Altogether, the Court finds that Frank Surveying has demonstrated a substantial likelihood of success on the merits for its DTSA claim.

### B.     *Substantial Threat of Irreparable Harm*

"To show irreparable injury[,] . . . it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Rather, the plaintiff "need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.* (internal citations omitted). In other words, an irreparable injury must be likely—but need not be a guarantee. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

The Court finds that Frank Surveying is threatened with irreparable harm if Harp, now working for a competitor, improperly possesses Frank Surveying's confidential information or otherwise discloses it to Manhard. Courts have frequently recognized that the disclosure of confidential information to the public or a competitor greatly diminishes the value of that information and is difficult to quantify in money damages. *See, e.g.*, *Intel Corp.*, 2019 WL 164958, at *5 ("Once a trade secret is disclosed . . . the special value of the material is destroyed or substantially diminished, establishing irreparable harm."); *Marquis Software Sols., Inc. v. Robb*, 2020 WL 955901, at *10 (N.D. Tex. Feb. 27, 2020) (Boyle, J.) ("[T]he loss of confidential information is a harm that is difficult to verify and to quantify.") (internal quotation omitted).

And because Manhard is Frank Surveying's competitor, disclosure—and thus irreparable harm—becomes more likely. *See* Doc. 2, Mot. TRO, 3; *Marquis*, 2020 WL 955901, at *10 ("Robb's role with Marquis is very similar to his role at QuestSoft—a company that directly competes with Marquis. These facts suggest a likelihood that Robb will disclose confidential information.").

However, the Court is not convinced that Frank Surveying's full suite of requested remedies is necessary to prevent irreparable harm. In addition to requesting the return of confidential information and a prohibition against its use or disclosure, Frank Surveying also asks that Harp be ordered to submit his electronic devices and cloud-storage accounts to forensic review. The Court denies those requests. Because a TRO is a drastic remedy designed only to "preserve the status quo and prevent irreparable harm just so long as is necessary to hold a hearing," *Tata Consultancy*, 2019 WL 2058772, at *2, the Court finds that preventing Harp from possessing, using, or disclosing Frank Surveying's trade secrets is adequate until the Court holds a hearing on Frank Surveying's motion for a preliminary injunction. *See also Intel Corp.*, 2019 WL

164958, at *5 (granting the TRO only to the extent that it prevented the disclosure or use of the materials and denying other requested forms of relief as unnecessary). The Court will consider the other requested forms of relief at the preliminary injunction stage.

C.   *Balance of Harms*

The balance of harms strongly favors Frank Surveying. As discussed above, Frank Surveying faces potentially irreparable harm absent a TRO securing its confidential information. Conversely, the burden on Harp is minimal. First, Harp claims no ongoing right to any of Frank Surveying's confidential information and says he has no such information in his possession anyway. Thus, the burden of ordering the return of Frank Surveying's confidential information is minimal. Similarly, restraining Harp from disclosing or using Frank Surveying's confidential information "only imposes the burden of inaction." *See id.* Thus, Frank Surveying's threatened injury greatly outweighs any harm the TRO might cause Harp.

D.   *Impairment of Public Interest*

Similarly, the narrow injunction at issue does not impair the public interest. Harp can continue his work with Manhard unrestricted. Frank Surveying will benefit from the protection of its confidential information. And, because Frank Surveying has demonstrated a prima facie case of trade secret misappropriation, *see supra* Section III(A), the public will benefit by the general protection of trade secrets and the enforcement of federal laws such as DTSA. *See TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 758 (S.D. Tex. 2009); *Intel Corp.*, 2019 WL 164958, at *6.

## IV.

## CONCLUSION

In sum, the Court finds that Frank Surveying has shown a substantial likelihood of success on its DTSA claim and a substantial threat of irreparable injury absent an injunction. The balance of harms strongly favors Frank Surveying, and a narrow injunction serves the public interest. However, the Court also finds that Frank Surveying's requested relief is overly broad for a TRO and goes beyond that required to prevent irreparable injury. As such, the Court **GRANTS in part and DENIES in part** Frank Surveying's Motion (Doc. 2) and **ORDERS** as follows: To the extent Defendant M. Dillon Harp has any of Frank Surveying's confidential, proprietary, or trade secret information in his possession, he is **ORDERED** to return such information to Frank Surveying. Harp is further enjoined and restricted from using or disclosing any and all confidential, proprietary, and trade secret information belonging to Plaintiff Frank Surveying Co., Inc. All other forms of requested relief are **DENIED.**

SO ORDERED.

**SIGNED: January 11, 2023.**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE