IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FRANK SURVEYING CO., INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 3:22-cv-02837-B |
| M. DILLON HARP, MANHARD | § | |
| CONSULTING LTD., and ALLEN | § | |
| PELOQUIN, | § | |
| | § | |
| Defendants. | § | |

## MEMORADUM OPINION & ORDER

Before the Court is Plaintiff Frank Surveying Co., Inc. d/b/a FSC, Inc. ("FSC")'s Motion for Partial Summary Judgment (Doc. 156). After considering the Motion, arguments, and applicable law, the Court **DENIES** the Motion.

I.

BACKGROUND

FSC is a land surveying company based in Columbus, Texas. Doc. 158-1, Pl.'s App'x, 1. In its simplest form, surveying means "making relatively large-scale, accurate measurements of the Earth's surfaces." John Lyman & John Wilfrid Wright, *surveying*, ENCYCLOPEDIA BRITANNICA (July 1, 2024), https://www.britannica.com/technology/surveying. Surveying includes: (1) determining existing relative horizontal and vertical points to map from land, and (2) the establishment of marks to control construction projects or to indicate land boundaries. *Id.*

FSC conducts multiple types of surveying including boundary surveying, construction surveying, and oil and gas surveying, which requires assessing existing or future wells pipelines, and

other relevant infrastructure. Doc. 158-7, Pl.'s App'x, 30; Doc. 158-9, Pl.'s App'x, 118. FSC accuses its former employee, Defendant M. Dillion Harp, and his new employer, Defendant Manhard Consulting Limited ("Manhard"), of misappropriating FSC's surveying maps for their own competitive advantage. FSC also accuses Harp of breaching a confidentiality agreement he executed during his employment with FSC. Doc. 156, Mot.

Harp is a licensed surveyor in Texas, New Mexico, and Louisiana. Doc. 158-1, Pl.'s App'x, 1. FSC hired Harp and eventually promoted him to Vice President of Surveying. *Id.* Harp worked in FSC's Fort Worth office, which he co-managed with another defendant in this case. *Id.* Harp was employed by FSC until November 22, 2022. Doc. 158-7, Pl.'s App'x, 77. Between 2016 and 2022, Harp was required to abide by FSC's Employee Handbook. Doc. 158-3, Pl.'s App'x, 8–9. The handbook states ". . . confidential information regarding [FSC] and its clients may be encountered. Employees are not to reveal or divulge any information inside or outside the office . . . . Any violation of the above will result in immediate termination." *Id.* at 9. The Employee Handbook does not define "confidential information." *See generally* Doc. 222, Defs.' Sealed App'x, 128–174.

On June 9, 2020, FSC emailed the company's employees, including Harp, asking them to execute an attached confidentiality agreement in light of "the [confidential] nature of work of some of our clients." Doc. 222, Defs.' Sealed App'x, 126. The same day, Harp signed the agreement ("Confidentiality Agreement"). Doc. 158-2, Pl.'s App'x, 4–5. Among other things, Harp agreed he would not (i) "disclose or divulge either directly or indirectly the Confidential Information to others unless first authorized to do so in writing by FSC, Inc. management," nor (ii) "reproduce [FSC's] Confidential Information nor use this information commercially or for any

purpose other than the performance of his[] duties for FSC, Inc." *Id.* at 4. The Confidentiality Agreement defines "Confidential Information" as "information or data of any kind concerning any matters affecting or relating to FSC, Inc. the business or operations of FSC, Inc., and/or the products, drawings, plans, processes, or other data of FSC, Inc. not generally known or available outside of the company." *Id.*

Later that summer, Harp had a conversation about his data sharing obligations in the context of his leaving FSC. On July 30, 2022, he texted with FSC's HR manager and another FSC employee.[1] Doc. 158-4, Pl.'s App'x, 10. Harp asked the HR manager whether Harp had signed a non-compete with FSC. *Id.* The HR Manager clarified Harp did not have a non-compete but was bound by the Confidentiality Agreement. *Id.* The HR manager also told Harp he was not allowed to copy materials from FSC's server. *Id.* His co-worker suggested that Harp could "email [s]tuff to clients," advising Harp to text a client "and ask [the client] to request dwg files." *Id.* The HR Manager chimed in that Harp should instead call the client so that "it's not in writing." *Id.* The following month, Harp interviewed with Manhard. Doc. 221, Defs.' App'x, 47. In late October 2022, Manhard offered Harp a position as a Director of Surveying, which he accepted. *Id.* Around the same time, Harp gave FSC notice of his resignation. *Id.* He continued to work for FSC until late November 2022. *Id.*

Meanwhile, on August 4, 2022, a representative from FSC's client, ExxonMobil, asked Harp and two other FSC employees for "information you have available for [ExxonMobil] operations including corners, lease lines, bores, etc[.]" Doc. 158-5, Pl.'s App'x, 11–12. The ExxonMobil representative sought this information because an internal geologist wanted "updated

---

[1] This employee, Allen Peloquin, is also a defendant in the case but the instant Motion does not concern claims against him.

spatial information . . . since [ExxonMobil] w[as] having issues staking and spacing various wells associated with [its] projects." Doc. 221, Defs.' App'x, 207. On August 8, 2022, one of the FSC employees responded by sending ExxonMobil two documents—one a .dwg file and the other a .crd file. Doc. 158-5, Pl.'s App'x, 11–12. This employee was "managed directly" by Harp. Doc. 158-7, Pl.'s App'x, 23. The same FSC employee sent two more files also formatted in dwg and crd. *Id.* at 13. The ExxonMobil representative put the files on her local drive but "forgot to do the rest of [her] job and pass them along" to the geologist. Doc. 158-12, Pl.'s App'x, 228.

On October 28, 2022, another ExxonMobil representative responded to the same email chain to ask FSC if the data sent on August 8, 2022 was "the most update[d] info." Doc. 158-6, Pl.'s App'x, 14. The same FSC employee that emailed the four previous files responded by attaching two additional files, formatted in dwg and crd. *Id.* On November 7, 2022, a third ExxonMobil representative sent two Manhard employees all six files. Doc. 159-1, Pl.'s Sealed App'x, 295–97. According to FSC, the trade secrets at issue are the six emailed files (the "Base Map Files"). Doc. 157, Pl.'s Mot. Br., 2. Doc. 159-1, Pl.'s Sealed App'x, 295–97. ExxonMobil hired Manhard for a project and the at least one of the Base Map Files was used by Manhard in support of that project. *See* Doc. 221, Defs.' App'x, 47.

The Base Map Files are survey drawings that incorporate information FSC has compiled from surveying certain geographic areas for clients. Doc. 157, Pl.'s Mot. Br., 2; Doc. 220, Resp., 7. FSC uses the Base Map Files for surveying jobs in Texas and New Mexico because they allow "FSC to reference the previously-collected [surveying] data when working in the same area." Doc. 158-1, Pl.'s App'x, 1–2. The parties agree that the Base Map Files contain "control points," or reference points, and objective boundary lines. *Compare* Doc. 157, Pl.'s Mot. Br., 2 *with* Doc. 220, Defs.'

Resp., 7; Doc. 158-7, Pl.'s App'x,, 31. Harp and Manhard (together, "Defendants") also do not dispute that the Files contain surveyors' legal opinions, boundary interpretations, and field notes. *Id.*; Doc. 158-7, Pl.'s App'x, 22, 44–46. However, Defendants assert some of the information in the Files is publicly available. *E.g., id.* at 45. FSC stores the Base Map Files on its network drive, which can be accessed by its employees through their network usernames and passwords. Doc. 158-18, Pl.'s App'x, 299.

On December 19, 2022, FSC filed a complaint and motion for a temporary restraining order, preliminary injunction and permanent injunction ("TRO Motion") against Harp. Docs. 1–2. The Court ordered an expeditated briefing scheduling and, on January 9, 2023, held a hearing for the TRO Motion. Docs. 4, 15. The TRO Motion was granted in part. Doc. 16, Mem. Op. & Order. On January 31, 2023, the parties submitted to an agreed preliminary injunction. Doc. 26. FSC amended its pleadings to add Manhard and other defendants to the suit. Doc. 46, Am. Compl. On January 29, 2024, FSC filed the instant Motion for Partial Summary Judgment. Doc. 156, Mot. FSC moves for summary judgment on its (1) Defense Against Trade Secrets Act ("DTSA") claim against Harp and Manhard, and (2) breach of contract claim against Harp. *Id.* The Court addresses each claim in turn.

## II.

## LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that, as a matter of law, the movant is entitled to judgment. *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003). On a motion for summary judgment, the burden is on the movant to

prove that no genuine issue of material fact exists. *Provident Life & Accident Ins. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the non-movant. *See Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 371-72 (5th Cir. 2002).

When the party with the burden of proof is the movant, it must establish each element of its claim as a matter of law. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Once the movant has met its burden, the burden shifts to the non-movant, who must show that summary judgment is not appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "This burden is not satisfied with 'some metaphysical doubt as to material facts,' . . . by 'conclusory allegations,' . . . by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III.

## ANALYSIS

A.     *DTSA Claim Against Harp and Manhard*

To prevail on a DTSA claim, a plaintiff must prove: (1) ownership of information that constitutes a trade secret; (2) that trade secret's misappropriation by another; and (3) the trade secret's relation to a good or service used in or intended for use in interstate or foreign commerce. 18 U.S.C. § 1836(b)(1).

The parties dispute whether the Base Map Files constitute trade secrets in satisfaction of the first element. *Compare* Doc. 157, Pl.'s Mot. Br., 6–8 *with* Doc. 220, Defs.' Resp., 16–27. A

"trade secret" under the DTSA includes business and technical information "the owner thereof has taken reasonable measures to keep . . . secret" and "derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). Whether a trade secret exists is a question of fact. *Centennial Bank v. Holmes*, No. 5:23-CV-044-H, 2024 WL 733649, at *6 (N.D. Tex. Feb. 20, 2024) (Hendrix, J.).

Courts look to six factors to determine whether information constitutes a trade secret:

> (1) the extent to which the information is known outside of [plaintiff's] business; (2) the extent to which it is known by employees and others involved in [plaintiff's] business; (3) the extent of the measures taken by [plaintiff] to guard the secrecy of the information; (4) the value of the information to [plaintiff] and to [its] competitors; (5) the amount of effort or money expended by [plaintiff] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Centennial Bank*, 2024 WL 733649, at *7. Applied to this case, these factors are inconclusive and thus preclude a determination that the Base Map Files are trade secrets as a matter of law. A threshold problem to the Court's analysis is that it was not provided the Base Map Files and therefore cannot review them against the parties' competing arguments. As discussed below, many factors also raise issues of material fact.

1. <u>The extent to which the Base Map Files are known outside of FSC's business</u>

The first factor is the only one that the evidence shows to weigh in FSC's favor. While Defendants emphasize that *parts* of the Base Map Files are publicly available, this argument does not create a material fact issue because the Files themselves generally were not known outside of FSC's business. *Centennial Bank*, 2024 WL 733649, at *7. Harp admits that the Base Map Files are

not public, and that they comprise of a "'conglomeration of information' that does not exist outside of FSC." Doc. 157, Pl.'s Mot. Br., 7; Doc. 158-7, Pl.'s App'x, 43. FSC also provides Harp's deposition testimony that he recalled the Base Map Files having only been shared externally in the single instance litigated here. Doc. 266, Reply, 4. By Harp's own admissions, the Base Map Files generally were not "known outside" FSC.

> 2. The extent to which the Base Map Files are known to FSC's employees

The parties do not seriously dispute that FSC employees knew about and had access to the Base Map Files after logging into FSC's computers or network. *See* Doc. 158-18, Pl.'s App'x, 299 (referencing FSC's "requiring usernames and passwords for employees"); Doc. 220, Resp., 20–21; Doc. 266, Reply, 3 (""[T]he reality that . . . [Files were] used by anyone working surveying projects."). FSC offers evidence that the Base Map Files were only accessible through a particular software, Doc. 266, Reply., 3, but fails to explain whether access to that software was limited. *Cf. Oracle Elevator Holdco, Inc. v. Exodus Sols., LLC*, No. 4:19-CV-4658, 2021 WL 4077581, at *17 (S.D. Tex. Sept. 8, 2021) (finding second factor disfavored plaintiff because "[a]lmost all [its] employees had access" to the alleged trade secrets). FSC points to one administrative level employee who could not access the software, Doc. 266, Reply, but this does not explain the extent to which the software was accessible. The Court does not know whether the software was selectively installed for employees requiring access to the Base Map Files, or generally installed for every non-administrative employee. Indeed, Defendants offer evidence that all non-administrative employees could access or edit the Base Map Files once they logged into with their FSC credentials. Doc. 221, Defs.' App'x, 121.[2] This factor is unclear but the evidence presented weighs against FSC.

---

[2] FSC's objection to such evidence as unreliable only underscores the need for a jury to make credibility determinations. Doc. 266, Reply, 3; *see Treece v. Perrier Condo. Owners Ass'n, Inc.*, 593 F. Supp. 3d

### 3. The extent of the measures taken by FSC to guard the secrecy of the Base Map Files

Whether FSC took reasonable measures to protect the Base Map Files here is another question better posed to a jury. The efforts required to maintain secrecy are those reasonable under the circumstances. *ResMan, LLC v. Karya Prop. Mgmt., LLC*, No. 4:19-CV-00402, 2021 WL 3403935, at *5 (E.D. Tex. Aug. 4, 2021). FSC did not take the simplest measure of labeling the Base Map Files as "confidential," or "trade secrets," nor did it train its employees to treat the Base Map Files as such. Doc. 221, Defs.' App'x, 27, 45, 121, 179, 183, 188. Additionally, the company's "password protection is standard practice for any computer in nearly any business and hardly indicates protection of a secret." *Oracle Elevator Holdco, Inc. v. Exodus Sols.*, LLC, No. 4:19-CV-4658, 2021 WL 4077581, at *18 (S.D. Tex. Sept. 8, 2021).

Nevertheless, FSC emphasizes that the confidentiality agreements it had its employees sign prohibited them from reproducing confidential information such as "drawings." 158-2, Pl.'s App'x, 4. There are several issues with this argument. FSC's rollout of confidentiality agreements was not instigated by FSC's own initiative but rather the concerns of its clients presumably over the survey information FSC collected about their property. *See* Doc. 222, Defs.' Sealed App'x, 126. Moreover, that FSC "required" its employees to sign confidentiality agreements does not mean that every employee did so. 158-1, Pl.'s App'x, 2. FSC has not provided evidence that all its employees signed and returned confidentiality agreements. Doc. 221, Pl.'s App'x, 36. Finally, assuming all FSC employees executed a confidentiality agreement, it is unclear that the agreements constitute a measure to keep the Base Map Files a secret. At least according to Harp's Confidentiality Agreement, FSC prohibited employees from reproducing information that is not

---

422, 441 (E.D. La. 2022) ("Generally, [i]ssues of credibility, including questions of intent, should be left to the jury." (citation omitted)).

generally known or available outside the company, 158-2, Pl.'s App'x, 4, but it remains an open question whether most of the information in the Base Map Files was generally available outside FSC. *Infra* Part III.A.4.

FSC touts its Base Map Files were only accessible through a particular software but as discussed, there is no evidence such software, in practice, served to guard the Base Map Files. Doc. 266, Reply., 3; *cf. BarZ Adventures Inc. v. Patrick*, No. 4:20-CV-299, 2023 WL 2478550, at *5 (E.D. Tex. Mar. 13, 2023) ("*[S]pecific* log-in credentials are required to access the information. . . . [And] *only (8) employees* may access a [subset of information]." (emphasis added)). While one administrative employee did not have the software to open Base Map Files on her computer, Doc. 221, Defs' App'x, 108–09, there is no evidence that FSC systematically cut administrative staff's access to the software or limited other employees' access to the software in another reasonable way. FSC did restrict access to its HR management data by limiting the individuals that could access certain network drives, Doc. 222, Defs.' App'x, 108, which suggests FSC could have similarly limited access to its Base Map Files. That the Base Map Files are "living compilations of data, updated frequently as new work" does not explain why FSC did not have measures to similarly limit access to the Base Map Files. Doc. 266, Reply, 3.

The very fact that the Base Map Files were easily transferred as regular course of business to at least one client upon a client's mere email request suggests that FSC did not have strong measures in place to protect its purported trade secrets. *See* Doc. 158-5, Pl.'s App'x, 12–14. The FSC employee who responded to ExxonMobil's multiple requests for information did not believe he needed to obtain written permission from anyone to provide ExxonMobil with the Base Map Files. Doc. 221, Defs.' App'x, 100. FSC's contention that the client request came at the direction

of the Harp and Manhard skips to the second element of misappropriation. The Base Map Files were apparently accessible to all employees, they lacked a confidentiality or similar label, and multiple employees contend they were not trained to treat the Files as confidential. The Court finds this factor cuts against FSC.

### 4. The remaining factors

The fourth factor, whether the Base Map Files are valuable to competitors, remains unclear. *See Centennial Bank*, 2024 WL 733649, at *7. The parties do not seriously dispute that the Base Map Files provide some value by simplifying surveying work in the same geographic areas surveyed by FSC. *See* Doc. 158-7, Pl.'s App'x, 43–44 (illustrating Harp's testimony that Base Map Files offer "convenience" value); Doc. 158-11, Pl.'s App'x, 211–12. But the remaining evidence FSC offers as to the Base Map Files' value is inconclusive. While FSC's expert testified the Base Map Files offer "very valuable information," in his report, he also opined "[i]t is virtually impossible for me to calculate . . . the value these files hold for a Surveying Firm." Doc. 158-11, Pl.'s App'x, 200; Doc. 191, Harvill Report, 9. FSC's expert admits that even if surveyors share points from their maps, they still need to go out and confirm if "something's changed." Doc. 158-11, Pl.'s App'x, 200, 212. The Court therefore does not find the fourth factor to favor one side over another.

FSC also has not provided evidence for the fifth factor, the amount of effort or money expended to develop the Base Map Files. *Centennial Bank*, 2024 WL 733649, at *7. The Court does not have the benefit of an estimated cost of development as FSC's expert was not asked to calculate the cost to create or re-create the Base Map Files. *See* Doc. 158-11, 214–215. Without having done any actual analysis, FSC's expert testifies that "the [F]iles would probably take years to

re-create." *Id.* at 215. The Court does not credit his unsupported testimony. FED. R. EVID. 702(d). FSC's co-owner testifies the Base Map Files were created from "the geographic locations in which [FSC] worked" over the years. Pl.'s App'x, 1. But it is unclear whether the Files themselves would actually require years to compile or whether they simply took years to create because of the pace of the client projects from which they arose. *Id.* FSC only emphasizes that the Base Map Files took years to compile without addressing this distinction. Doc. 157, Mot. Br., 7; Doc. 266, Reply, 7. The Court does not find the evidence warrants finding this factor in FSC's favor.

The sixth factor, whether the information can be properly acquired or easily duplicated, is also unsettled. There is evidence from both sides that some portion of information in the Base Map Files is publicly available through state government websites and thus could be duplicated. Doc. 221, Defs.'s App'x, 44 (Harp Declaration), 65 (Kowalik Deposition Testimony), 122 (Martin Declaration), 234 (Harvil Report); *but see* Doc. 158-11, Pl.'s App'x, 215 (FSC expert testifying "the files would take probably years to re-create"). The evidence does not make clear what proportion of the information in the Base Map Files are publicly available or may be duplicated. The Court also cannot try to review for itself the types of information conceded as public or copyable because it does not have access to the Base Map Files. Thus, this factor does not favor one side or another.

Finally, FSC's attempt to overcome the first element of a DTSA claim by citing *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 667 (S.D. Tex. 2010) is unavailing. *See* Doc. 266, Reply, 6. The proposition FSC cites to addresses one of two ways that Texas *state* courts have analyzed a *state* trade secrets claim. *Rimkus Consulting Group, Inc.*, 688 F. Supp. 2d at 667. *Rimkus Consulting Group, Inc.* did not concern a DTSA claim nor has FSC shown that the legal proposition it cites from *Rimkus* is applicable to DTSA claims. *See generally id.*

In sum, the record evidence raises genuine issues of material fact concerning whether the Base Map Files are trade secrets. The Court need not consider the other elements of the DTSA claim. In light of the foregoing, Court **DENIES** FSC'S motion for summary judgment as to its DTSA claim.

### B. *Breach of Contract Claim Against Harp*

"Under Texas law, '[t]he essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.'" *Roberts v. Overby-Seawell Co.*, No. 3:15-CV-1217-L, 2018 WL 1457306, at *7 (N.D. Tex. Mar. 23, 2018) (Lindsay, J.) (alteration in original) (quoting *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009)). FSC has not met its burden to prove that no genuine issue of material fact exists as to the element of breach. *Provident Life & Accident Ins.*, 274 F.3d at 991.

FSC contends that Harp breached Sections B & C of the Confidentiality Agreement. Doc. 157, Mot. Br. 10. Harp signed the Confidentiality Agreement in mid-2020 and FSC contends his violated this contract by using the Base Map Files at Manhard, after Harp left FSC. *Id.* While Under Section B of the Confidentiality Agreement, Harp could not "disclose or divulge directly or indirectly the Confidential Information to others . . . ." Doc. 158-2, Pl.'s App'x, 4. Section C prohibits reproducing or "use of [Confidential] [I]nformation commercially or for any other purpose than the purpose of [Harp's] duties for FSC Inc." Doc. 158-2, Pl.'s App'x, 4.

FSC has not satisfied the first element of its contract claim as a matter of law. FSC argues that Harp breached the Confidentiality Agreement by using the Base Map Files at Manhard once Manhard obtained the Files from ExxonMobil. Doc. 157, Mot. Br., 10; Doc. 158-7, Pl.'s App'x,

80; 158-14, Pl.'s App'x, 275. The plain language of the Confidentiality Agreement does not permit the inference that Harp was contractually bound by FSC after his employment terminated. FSC offers no support for the conclusion that the Confidentiality Agreement's term continued after Harp left FSC such that it was enforceable at the time of the alleged breach. FSC also does not argue nor establish as a matter of law that Harp committed an act of breach while employed at FSC. Doc. 157, Mot. Br., 9–10.

Assuming the Confidentiality Agreement was valid and enforceable at the time of the alleged breach, FSC has not established as a matter of law that Harp violated Sections B and C of the contract. There exists a genuine issue of fact as to whether Harp "directly or indirectly" shared the Base Map Files with Manhard under Section B of the Confidentiality Agreement. Doc. 158-2, Pl.'s App'x, 4. On the one hand, some evidence certainly suggests Harp had ill-intentions in connection to his departure from FSC. The HR manager advised Harp to send FSC information to clients as a means of copying it. *See* Doc. 158-4, Pl.'s App'x, 10. Harp was also advised to avoid a paper trail by calling clients to execute this scheme. *Id.* When ExxonMobil requested information the next month, the FSC employee who responded by sending over the Base Map Files was "managed directly" by Harp. Doc. 158-5, Pl.'s App'x, 12–14; Doc. 158-7, Pl.'s App'x, 23. On the other hand, certain evidence could lead a reasonable juror to find that Harp did not "directly or indirectly" share the Base Map Files. ExxonMobil had a legitimate business reason for its request: providing updated spatial information to its geologist. *See* Doc. 221, Defs.' App'x, 207–08. ExxonMobil also engaged Manhard for work and willingly shared the Base Map Files with Manhard. *Id.* at 222–24.

Whether Harp acted on scheme hatched by FSC's HR manager and Harp's co-worker is a

question for a jury. *See Treece.*, 593 F. Supp. 3d at 441 ("Generally, [i]ssues of credibility, including questions of intent, should be left to the jury." (citation omitted)). Harp denies contacting clients, including the ExxonMobil representatives, to have them request information. Doc. 158-7, Pl.'s App'x, 68–69. The requesting ExxonMobil representative has also denied she spoke with Harp or any FSC employee before emailing her request. Doc. 158-12, Pl.'s App'x, 230. Relatedly, whether the initial requesting ExxonMobil representative genuinely "forgot" to share the information with the geologist or intentionally facilitated a scheme orchestrated by Harp to obtain the Base Map Files is a credibility question for the jury. *Id.* at 228. The Court finds the evidence insufficient to show as a matter of law that Harp made direct or indirect disclosures to Manhard in violation of Section B of the Confidentiality Agreement. For the same reasons, the Court does not find that Harp "reproduce[d]" the Base Map Files Section C as a matter of law. Doc. 158-2, Pl.'s App'x, 4.

FSC's breach of contract claim raises multiple issues of material fact. FSC's motion for summary judgment as to its contract claim against Harp is therefore **DENIED**.

## IV.

## CONCLUSION

There are genuine issues of material fact that preclude judgment in favor of FSC for its DTSA and contract claims. Therefore, FSC's Partial Motion for Summary Judgment is **DENIED**.

**SO ORDERED**.

**SIGNED: August 1, 2024.**

*[signature]*
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE